UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FORMULATRIX, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO.  15-12725-JGD |
| RIGAKU AUTOMATION, INC. and | ) | |
| RIGAKU AMERICAS HOLDING, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF DECISION AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

November 1, 2018

DEIN, U.S.M.J.

## I.  INTRODUCTION

Plaintiff Formulatrix, Inc. ("Formulatrix") has brought this action against Rigaku

Automation, Inc. ("Rigaku") and Rigaku Americas Holding, Inc. ("Rigaku Americas") (together

"Rigaku") for breach of contract and other causes of action related to a January 2015 Customer

Support Agreement ("CSA") between the parties.  At the heart of Plaintiff's complaint is its

allegation that Rigaku failed to comply with certain provisions of the CSA governing the

transmission of business documents within a 90 day period.  Defendants dispute this allegation

and assert counterclaims against Plaintiff, alleging that Formulatrix breached the CSA by

improperly withholding installment payments due to Rigaku and that Formulatrix violated

Mass. Gen. Laws ch. 93A by engaging in a pattern of extra-contractual demands coupled with

the threat of contractual nonperformance or litigation.

On June 22, 2015, Formulatrix initiated the instant action against Defendants alleging the following causes of action: breach of contract; tortious interference with contractual and/or advantageous business relationship; breach of the covenant of good faith and fair dealing; request for attorneys' fees under the CSA; unfair and deceptive conduct in violation of Mass. Gen. Laws ch. 93A § 11; and enforcement of a guaranty given by Rigaku America in the CSA. (See Docket No. 1).  On April 5, 2016, Defendants filed a Counterclaim asserting claims of breach of contract; breach of the covenant of good faith and fair dealing; declaratory judgment; violation of Mass. Gen. Laws ch. 93A § 11; and attorneys' fees under the CSA.  (See Docket No. 17).  On August 25, 2016, following a ruling on Defendants' motion to dismiss, which struck Formulatrix's tortious interference and ch. 93A claims (Docket No. 15), Formulatrix filed an Amended Complaint reasserting the claims that survived Defendants' motion to dismiss.  (See Docket No. 42).  On September 1, 2016, Defendants filed a Counterclaim reasserting the same causes of action asserted in its original Counterclaim.  (See Docket No. 43).

This matter is before the court on Formulatrix's "Motion for Partial Summary Judgment" (Docket No. 66), by which Formulatrix is seeking summary judgment with respect to Rigaku's claims for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, and (3) violation of Mass. Gen. Laws ch. 93A.  This matter is also before the court on Rigaku's "Motion for Partial Summary Judgment" (Docket No. 70), by which Rigaku is seeking summary judgment with respect to all of Formulatrix's remaining claims, and affirmatively on its own breach of contract and breach of the covenant of good faith and fair dealing claims.  Both parties are also seeking summary judgment on the issue of entitlement to attorneys' fees.  For the reasons detailed herein, Formulatrix's Motion for Partial Summary Judgment is DENIED and

Rigaku's Motion for Partial Summary Judgment is ALLOWED IN PART AND DENIED IN PART.

Specifically, Rigaku's motion is ALLOWED with respect to Count I of Rigaku's Counterclaim

(breach of contract), Count II of Formulatrix's Amended Complaint (breach of covenant of good

faith and fair dealing), but DENIED with respect to Count IV of Formulatrix's Amended

Complaint (guaranty) and Count V of Rigaku's Counterclaim (attorneys' fees).  With respect to

Count I of Formulatrix's Amended Complaint (breach of contract), Rigaku's motion is ALLOWED

as to the reports required by Art. 2.02 and accurate representations and warranties under

Schedule 5.06, but otherwise DENIED.  As detailed herein, this court concludes that the issue of

entitlement to attorneys' fees is premature.

## II.  <u>STATEMENT OF FACTS</u>[1]

The following facts are undisputed unless otherwise indicated.

### <u>The CSA</u>

Formulatrix is in the business of developing, manufacturing, and selling protein

crystallization automation products ("Automation Products") to customers in the protein

---

[1]  Unless otherwise indicated, the facts are derived from Formulatrix's Statement of Material Facts in Support of its Motion for Partial Summary Judgment (Docket No. 68) ("PF __"); the Affidavit of Counsel in Support of Formulatrix's Motion for Partial Summary Judgment (Docket No. 69) and the exhibits attached thereto ("PEx. __"); Rigaku's Response to Formulatrix's Statement of Material Facts (Docket No. 81) ("DR __") and Rigaku's Additional Statement of Material Facts (Docket No. 81) ("DOppF __"); Rigaku's Appendix of Materials Supporting its Opposition to Formulatrix's Motion for Partial Summary Judgment (Docket No. 82) and the exhibits attached thereto ("DOppEx. __"); Formulatrix's Responses to Rigaku's Additional Statement of Material Facts (Docket No. 85) ("PROppF __"); Formulatrix's Affidavit of Counsel in Support of its Reply Brief (Docket No. 86) and the exhibits attached thereto ("PReply Ex. __"); Rigaku's Statement of Undisputed Material Facts in Support of its Motion for Partial Summary Judgment (Docket No. 72) ("DF __"); Rigaku's Appendix of Materials Supporting its Motion for Partial Summary Judgment (Docket No. 73) ("DEx. __"); Formulatrix's Responses to Rigaku's Statement of Material Facts (Docket No. 78) ("PR __"); Formulatrix's Affidavit of Counsel in Support of its Opposition to Rigaku's Motion for Partial Summary Judgment (Docket No. 79) and the exhibits attached thereto ("POppEx. __"); and Rigaku's Appendix of Materials Supporting its Reply Brief (Docket No. 88) ("DReplyEx. __").

crystallization industry.  (PF ¶ 1).  As of the beginning of 2015, Rigaku was a direct competitor to

Formulatrix in the Automation Products industry.  (PF ¶¶ 2, 4).  On January 15, 2015,

Formulatrix presented Rigaku with an offer to purchase its assets, and thereafter, the two

companies engaged in negotiations related to the offer.  (DOppF ¶ 1).

Effective January 20, 2015, Formulatrix and Rigaku entered into a Customer Support

Agreement ("CSA" or "Agreement").  (PF ¶ 2).  Generally speaking, under the CSA, Rigaku

agreed to exit the business of developing, manufacturing, and selling protein-crystallization-

automation equipment; to transfer certain assets and license certain intellectual property to

Formulatrix; to transfer certain business documents to Formulatrix within 90 days; and to

provide transition support services to Formulatrix for up to 90 days.  (See PEx. 1 Arts. 1.01, 1.02,

2.01, 2.04, 3.01).  In turn, Formulatrix agreed to provide support services to Rigaku's protein-

crystallization customers and to pay Rigaku $2 million upon the execution of the CSA and then

an additional sum of $1.825 million in equal installments over the course of 12 months

commencing on January 20, 2016, one year after the execution of the CSA.  (See PEx. 1 Arts.

1.02, 4.01).

The parties agree that Formulatrix did not conduct due diligence with respect to

Rigaku's financial representations and warranties before signing the CSA.  (PF ¶ 6; DR ¶ 6).

However, the parties dispute whether this was by mutual agreement, as Rigaku contends, or

because Rigaku refused to allow Formulatrix to conduct such due diligence, as Formulatrix

contends.  (See DR ¶ 6; PROppF ¶ 2).  Among the representations and warranties provided by

Rigaku in the CSA is a schedule containing Rigaku's financial information.  (PEx. 1 Art. 5.06,

Schedule 5.06).  Rigaku's financial information, provided in Schedule 5.06, includes Rigaku's

revenue for FYE2014 and projected revenue for FYE2015.  (Id.).  Formulatrix asserts, but Rigaku

disputes, that Formulatrix agreed to pay Rigaku the amount of monetary consideration in the

CSA in reliance upon Rigaku's representations and warranties as to such revenue. (See PF ¶ 5;

DR ¶ 5).

At the heart of Formulatrix's case is the CSA's records transfer provision, which provides

in relevant part:

> Art. 2.04 Records.  On or promptly following the Effective Date, and in no
> event later than ninety (90) days following the Effective Date, Rigaku shall
> deliver to Formulatrix a copy of all of the following records of Rigaku
> (whether such materials are evidenced in writing, electronically or other-
> wise) with respect to the Products[2]: (i) purchasing and production records;
> (ii) all customer lists (including contact information for each customer);
> (iii) all vendor, supplier and service provider lists (including a copy or
> description of the underlying commercial agreements or arrangements
> with such vendors, suppliers or service providers); (iv) blueprints, tech-
> nology, technical designs, drawings, specifications; (v) pricing and cost
> information, including a copy of any purchase order to be filled by
> Formulatrix, (vi) service support records and (vii) other books, records and
> files used or held for use by or on behalf of Rigaku, in each case which are
> solely related to the Products or used solely in conjunction with the
> Business[3] (the "Records").  Rigaku shall provide all Records in excel format
> or shall provide Formulatrix with a copy of the software necessary to
> access the Records in their existing format, in each case to the extent
> reasonably practicable.

(PEx. 1 Art. 2.04).

At issue in the instant case is whether Rigaku breached the CSA's record transfer

provision by failing to transmit within 90 days certain documents that Formulatrix asserts were

required to be transferred pursuant to the CSA.  Specifically, the parties dispute whether the

---

[2] Defined as "protein crystallization automation products."  (See PEx. 1 recitals).

[3] Defined as the business of "developing, manufacturing and selling protein crystallization automation
products . . . for protein crystallization."  (See PEx. 1 recitals).

transfer of documents related to historical instrument sales and service revenue (invoices, quotes, and purchase orders) was required under the CSA, and whether, if required, the transfer of these documents and/or their transfer within 90 days was a material term of the CSA.  (See PF ¶¶ 5, 7; DR ¶¶ 5, 7; Docket No. 67 at 6, 12; Docket No. 80 at 14-15).  Formulatrix contends that such documents were necessary for it to confirm Rigaku's representations in the CSA regarding Rigaku's financial information so that Formulatrix could determine if the purchase price Formulatrix had agreed to was justified.  (See Docket No. 67 at 11-12).  Rigaku contends that these documents were irrelevant since the purchase price was not dependent on any historic sales and revenue figures and that Formulatrix is using the documents as a belated justification for failing to make payments when due.  (See Docket No. 80 at 1, 14-15, 20).

The CSA also provides for the award of attorneys' fees, stating that "In any action or proceeding brought to enforce any provision of this Agreement, or where any provision hereof or thereof is validly asserted as a defense, the successful party shall be entitled to recover reasonable attorneys' fees in addition to any other available remedy."  (PEx. 1 Art. 9.12).  The parties dispute which party should be considered the "successful party" entitled to attorneys' fees in the present litigation.

### Performance During The 90 Day Record Transfer Period

Immediately following the execution of the CSA, the parties began performance.  There is no dispute that Formulatrix transferred $2 million to Rigaku and that Rigaku stopped developing, manufacturing, and selling protein-crystallization products, announced this stoppage to both its staff and its customers, and also encouraged third parties to contact Formulatrix to purchase additional protein-crystallization products.  (DF ¶ 3; DOppF ¶ 4; PROppF ¶ 4).  Rigaku

also began providing Formulatrix with transition support by tasking Rigaku personnel to facilitate the transition of support services; giving Formulatrix access to its intellectual property; and transferring Rigaku source code and software in accordance with the CSA. (DOppF ¶¶ 4, 7; PROppF ¶¶ 4, 7). As of January 21, 2015, Rigaku began transferring records and other data related to its Automation business to Formulatrix by making data available to Formulatrix through a dedicated VPN (virtual private network) and by way of email transfers. (DOppF ¶ 8).

Between January and April 20, 2015, Formulatrix communicated to Rigaku frustration with the pace, organization, accuracy, and completeness of the records it was receiving from Rigaku. (See DOppEx. 18; PEx. 11; PEx. 14). On January 30, 2015, Jeremy Stevenson, the President and CEO of Formulatrix, emailed Rigaku's CFO expressing concern that the data Rigaku was sending to Formulatrix wasn't "being validated," and asked whether there was a way to reconcile Rigaku's service revenue figures listed in the CSA with the records being transferred to Formulatrix. (See DOppEx. 18 at 1). On March 11, 2015, Stevenson again emailed Rigaku expressing concern about the pace of the record transfer and frustration that Formulatrix had not yet been able to get a complete customer list from Rigaku as of that date. (PEx. 11 at RIGAKU-001691). Stevenson indicated that Formulatrix needed the data from the record transfer both to "take over operations of support, and to validate the rep[resentations] and warrant[ies] in the Customer Service Agreement," and that he wouldn't consider the data transfer properly completed until Formulatrix could "validate [that] it all ties out – revenue, [purchase orders], customers, service contracts, installed systems and service call data." (Id.). Rigaku's CFO responded, stating that while the CSA did not call for the data to be delivered in a particular manor, he "appreciate[d] the desire to get data in a format that is easy to review,"

and his team was working to get Formulatrix "clean" data.  (Id. at RIGAKU-0001690).  After this exchange Rigaku and Formulatrix continued to work together on the data transfer.  It is undisputed that Formulatrix began to take over Rigaku's customer support obligations in mid-April 2015.  (See DOppF ¶ 18).

On April 3, 2015, Formulatrix emailed Rigaku again expressing concerns, this time about received data sets that were missing customer quotes and invoices.  (PEx. 14).  Formulatrix relayed that it needed that information to "move forward with maintenance" and "verify the representations and warranties" in the CSA.  (Id.).  During the record transfer process, Formulatrix asked Rigaku to quality check its data and service contract records prior to sending them to Formulatrix.  (See PROppF ¶ 11; DOppEx. 10 at 38).  Rigaku never refused to provide the data and records Formulatrix requested, in the formats requested.  (See DOppF ¶ 15; PROppF ¶ 15).  A Rigaku employee who worked on the record transfer averred that members of Rigaku's transfer team "incurred significant time and expense quality-checking data, providing reformatted data, and creating records that did not previously exist," which "greatly slowed down the transfer process."  (DEx. 16 at 1-2).  Formulatrix does not dispute that its request that Rigaku quality check its data slowed down the data transfer process.  (See PROppF ¶ 12).

On April 20 and 21, 2015, Formulatrix emailed Rigaku spreadsheets identifying purchase orders, quotes, and invoices that Formulatrix believed it had not yet received.  (PF ¶ 11).  On April 27, Rigaku responded, advising that the invoices related to its current service contracts had been uploaded to the shared VPN folder.  (PF ¶ 11; PEx. 17 at 1).

<u>**Communications Leading Up To Litigation**</u>

Though the parties continued to work together under the CSA after the April 20, 2015 record transfer deadline, their relationship continued to break down.  Formulatrix asserts, but Rigaku disputes, that Rigaku interfered with Formulatrix's attempts to hire former Rigaku employees.  (See DF ¶ 4; PR ¶ 4; PEx. 5 at 7-8).  Additionally, after the record transfer deadline, Formulatrix personnel informed Rigaku that Formulatrix would withhold support service to Rigaku customers until Formulatrix received all of the data.  (See DOppEx. 9 at 159; DOppEx. 25 at 1).  Rigaku's CFO brought this information to the attention of Formulatrix's President, asserting that Rigaku had provided Formulatrix with "enough information to carry out the support services."  (See PReplyEx. 8 at 3).  Formulatrix's President responded by stating that despite Formulatrix's belief that Rigaku had breached the agreement, Formulatrix had "not stopped [its] effort to take over support."  (PReplyEx. 4 at 3).  However, he subsequently clarified that Formulatrix was not yet in a position to take over European support of Rigaku products because Formulatrix "lack[ed] documents and . . . [did not] have a team in place."  (Id. at 2).

As of around May 1, 2015, Formulatrix engaged Rigaku in discussions regarding a potential contract addendum related to Rigaku's continued transfer of data and records.  (See PEx. 18).  Formulatrix sent Rigaku an early stage draft of its proposed addendum to the CSA, which required that records be provided in a specific format and be fully quality-checked.  (Id. at 3-4).  The draft addendum also provided that if Rigaku failed to meet a revised record transfer deadline, Formulatrix would be entitled to a refund of the $2 million in consideration it had paid and would have no further obligations under the contract.  (Id. at 4).  Rigaku reviewed the proposed addendum, but ultimately did not agree to an amendment.  (See PEx. 19 at 1;

9

DOppEx. 28; DOppEx. 29).  On June 18, 2015, Formulatrix emailed Rigaku stating that there

were "two directions we can go": either negotiate an amendment to the CSA by the following

week wherein, Rigaku would agree to "[p]ayment of $100K per month for each month the data

is not transferred, retroactive to the due date"; "[p]ayment of $50K per month for each month

where either [t]he service revenue reports or payments aren't received, retroactive to the due

date of the first report"; coverage of "legal fees post contract closing and through acceptance

of the agreement"; and an agreement to deliver data that "will be meaningful and substantially

correct as was verbally promised to us when negotiating the contract," or Formulatrix would

file suit against Rigaku with "a Complaint prepared" and "ready to submit."  (DOppEx. 29).

Formulatrix further stated that if Rigaku did not respond by the next day, it would assume that

Rigaku was not agreeing to negotiate the amendment.  (See id.).  It is Rigaku's position that

through these discussions about amending the contract and this threat of litigation, Formulatrix

violated ch. 93A.

On June 22, 2015, Formulatrix filed the Complaint in this action.  (See Docket No. 1).

Formulatrix took the position that, to the extent that Rigaku had not provided Formulatrix with

invoices, quotes, or purchase orders to validate Rigaku's service revenue as listed in the CSA,

such unvalidated revenue constituted damages Formulatrix had suffered from Rigaku's alleged

breach of contract.  (See DEx. 8 at 9-10).

### Continued Records Transfer

The parties agree that by June 2, 2015, after the record transfer deadline but before the

filing of the instant action, Rigaku had transferred and quality checked all engineering data to

Formulatrix.  (DOppF ¶ 25).  By July 29, 2015, Rigaku had transferred and quality checked all of the CRM (customer relationship management) data.  (DOppF ¶ 26; PROppF ¶ 26).

On July 28, July 31, September 19, and November 4, 2015, Formulatrix emailed Rigaku supplemental lists of purchase orders, quotes, and invoices that Formulatrix had not received. (PF ¶ 13).  Rigaku responded with additional information and records throughout this period and into January 2016.  (PF ¶ 14).

Rigaku asserts that by January 13, 2016, it had transferred all data and records that Formulatrix had identified as missing in any outstanding list.  (DR ¶ 13).  On January 19, 2016, the day before the first installment payment was due, Rigaku emailed Formulatrix stating that Rigaku believed it had transferred the last of the data to Formulatrix.  (DOppEx. 38). Formulatrix's CFO responded the next day, stating "I will not have time available to focus on this for about two weeks.  I'll certainly review and respond as usual."  (Id.).  Rigaku asserts that Formulatrix never provided Rigaku any further notice that it believed there were additional records missing.  (DOppF ¶ 36).  Formulatrix disagrees, asserting that it provided notice via responses to discovery requests in the instant action, discussed below.  (See PROppF ¶¶ 36, 38-40; PF ¶¶ 17-18).

Formulatrix asserts that Rigaku did not complete its data transfer obligation under the CSA until September 2016, when Rigaku transferred the last of the service contract-related invoices, quotes and purchase orders.  (See PROppF ¶ 32; PF ¶¶ 18-19).  As discussed further below, Rigaku contends that Formulatrix did not provide Rigaku with sufficient information to identify these documents as missing until August 11, 2016.  (DR ¶ 19).

**Installment Payment Obligation**

It is undisputed that pursuant to the CSA, Formulatrix was required to begin paying the $1.825 million in monthly installment payments to Rigaku on January 20, 2016.  (See PR ¶ 2; PEx. 1 Art. 4.01).  In February 2016, Formulatrix transferred into a separate account to which Rigaku did not have access, the first two installment payments due to Rigaku under the CSA.  (PF ¶ 15; DR ¶ 15).  As subsequent monthly installments came due throughout 2016, Formulatrix continued to segregate payments into that account and furnish statements to Rigaku.  (PF ¶ 16).  Formulatrix asserts that it was entitled to set aside the payments due to what it considered to be Rigaku's prior material breach of the CSA and pending Rigaku's compliance with the CSA's record transfer provision.  Rigaku asserts that Formulatrix was not justified in failing to pay Rigaku the installment payments on time and thus Formulatrix breached the CSA.

On July 1, 2016, Formulatrix, in response to a request for production made by Rigaku in the context of this litigation, produced two Microsoft Excel files bates-labeled FORMULATRIX 2045 and 2046.  (DOppF ¶ 39; PROppF ¶ 39).  On August 11, 2016, Formulatrix served its supplemental response to Rigaku's first set of interrogatories, in which Formulatrix explained that FORMULATRIX 2045 and 2046 listed invoices, quotes, and customer purchase orders that it believed Rigaku had failed to provide in violation of the record transfer provision of the CSA.  (See DOppF ¶ 41; PEx. 6 at 2-3).  The parties dispute whether Formulatrix had previously identified those files to Rigaku as outstanding.  (DOppF ¶ 41; PROppF ¶¶ 41, 44).

On September 21, 2016, Rigaku produced to Formulatrix, as a supplemental initial disclosure pursuant to Fed. R. Civ. P. 26, the purchase orders, quotes, and invoices relating to

its support-services revenue for FYE2014 and FYE2015 that Formulatrix had identified as unproduced on FORMULATRIX 2045 and 2046.  (See DF ¶ 7; DOppF ¶ 44).  Based on these productions, Formulatrix contended that it was finally able to verify $810,748 of FYE2014 revenue and $344,243 of FYE2015 revenue that it had not previously been able to confirm. (See PEx. 6 at 2-3; PReplyEx. 2 at 2; PROppF ¶ 14).  Accordingly, Formulatrix no longer asserts that it has suffered damages in the form of service revenue that has not been validated.  (See Docket No. 77 at 5-7).

The parties entered into settlement negotiations, and on December 14, 2016, Formulatrix wired to Rigaku all of the installment payments that had been held in the separate account in the amount of $1.825 million. (PF ¶ 20; DF ¶ 3; PReplyEx. 1 at 3).  The parties dispute whether Formulatrix attempted to condition the release of the installment payments on certain amendments to the CSA.  (See DOppF ¶ 48; PROppF ¶ 48).  However, it is undisputed that no further amendments to the CSA were agreed upon and that Formulatrix released all installment payments in full to Rigaku.  (See DOppF ¶ 51; PF ¶ 21).  Rigaku asserts that Formulatrix owes it damages in the form of interest on the previously withheld installment payments.  (DR ¶ 21).

Additional factual details relevant to the court's analysis are described below where appropriate.

### III.  ANALYSIS

#### A.    Standard of Review - Summary Judgment

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822

(1st Cir. 1991)) (additional citation omitted).  The burden is upon the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  Id. (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue."  PC Interiors, Ltd., 794 F. Supp. 2d at 275.  The opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993).  Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial.  Id. at 841 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  The court affords "no evidentiary weight to conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative."  Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (internal quotation marks and citation omitted).  Rather, "[w]here, as here, the nonmovant bears the burden of proof on the dispositive issue, it must point to 'competent evidence' and 'specific facts' to stave off summary judgment."  Id. (citation omitted).

14

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). "'When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56.'" Peck v. City of Boston, 750 F. Supp. 2d 308, 312 (D. Mass. 2010) (quoting Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991)).

Applying these principles to the instant case compels the conclusion that Formulatrix's motion for partial summary judgment must be DENIED and Rigaku's motion for partial summary judgment must be ALLOWED IN PART AND DENIED IN PART.

### B.    Formulatrix's Breach of Contract Claim Against Rigaku

In its Amended Complaint, Formulatrix asserts a breach of contract claim against Rigaku, alleging that Rigaku had violated the terms of the CSA by (1) failing to comply with its record transfer obligations under Art. 2.04, (2) failing to provide the reports it was obligated to provide under Art. 2.02, (3) interfering with Formulatrix's ability to hire Rigaku employees, and (4) failing to provide Formulatrix with accurate representations and warranties in Schedule 5.06. Rigaku has moved for summary judgment on Formulatrix's breach of contract claim with respect to each of these allegations. Formulatrix has not moved for summary judgment on its own breach of contract claim. The court shall address each allegation in turn. As detailed herein, there are disputed facts as to whether Rigaku breached the CSA by failing to produce all the documents within 90 days or whether such a production was excused. Similarly, there are

15

disputed facts as to whether Rigaku interfered with Formulatrix's ability to hire former Rigaku employees. However, Rigaku's motion for summary judgment as to the breach of contact claim is otherwise allowed.

### Breach of Record Transfer Obligations

As noted above, Art. 2.04 of the CSA governs the transfer of business records from Rigaku to Formulatrix. Formulatrix claims that Rigaku breached its contractual obligations under Art. 2.04 by failing to complete the record transfer by the deadline and by providing data that was "not in a form [or] to a degree that enabled Formulatrix to effectively provide customer support services." (See Docket No. 42 ¶ 28). Rigaku seeks summary judgment as to both allegations.

"The interpretation of a contract constitutes a question of law for the court." Balles v. Babcock Power Inc., 476 Mass. 565, 571 n.12, 70 N.E.3d 905, 911 n.12 (2017). "When contract language is unambiguous, it must be construed according to its plain meaning." Id. at 571-72, 70 N.E.3d at 911. "Only if the contract is ambiguous is there an issue of fact for the [factfinder]." Fairfield 274-278 Clarendon Tr. v. Dwek, 970 F.2d 990, 993 (1st Cir. 1992).

As to the format of the record transfer, the CSA provides that "Rigaku shall provide all Records in excel format or shall provide Formulatrix with a copy of the software necessary to access the Records in their existing format, in each case to the extent reasonably practicable." (PEx. 1 Art. 2.04). This provision of the contract is unambiguous, and imposes no specific requirements on Rigaku regarding the organization of the transferred documents, other than that they be transferred in excel or native format. Furthermore, it is clear that pursuant to this provision of the CSA, Rigaku did not make any specific promises regarding the ease of

transferability of its records, the number of repositories in which its records were housed, or

the completeness of individual records.  Thus, any claim by Formulatrix that Rigaku breached

Art. 2.04 of the CSA due to allegations of disorganization, difficulty of transferability, number of

repositories, or completeness of individual records, does not constitute a contractual breach.

　　　To the extent that Formulatrix contends that Rigaku breached the contract by failing to

provide all historical records within 90 days to "validate Rigaku's financial representations and

warranties under the Agreement" (Docket No. 67 at 6), Formulatrix has not cited to any

contractual provisions supporting its contention that Rigaku's records were intended to be used

for such a purpose.  Rather, a reading of the CSA as a whole indicates that the primary purpose

of the record transfer provision was to provide Formulatrix with sufficient records to continue

Rigaku's business.[4]  Moreover, there is evidence in the record that the parties engaged in a

course of conduct pursuant to which Formulatrix would request specific information which

Rigaku would then provide,[5] which may be found to constitute an agreed upon method of

production.  See Vita v. Berman, DeValerio & Pease, LLP, 81 Mass. App. Ct. 748, 755, 967 N.E.2d

1142, 1148 (2012) (citing Restatement (Second) of Contracts § 202 (1981)) (court considers

course of performance in interpreting contract).  See also Ideal Health, Inc. v. Blechman, 711 F.

---

[4]  For example, there are no penalties in the CSA if historical financial information was incorrect, nor are there any provisions requiring Rigaku to identify the records on which the financial information was based.  In addition, the financial "representations" are quite limited (see PEx. 1 Art. 5.06, Schedule 5.06), and principally relate to Rigaku's warranty that, to its "estimation and belief," Formulatrix's Service Business Profit would be at least $200,000 per year for two years.  (See PEx. 1 Art. 5.07).  It is undisputed that this goal was met by Formulatrix.  (DEx. 4 at 180-81; PROppF ¶ 6).

[5]  Such a course of conduct is consistent with Art. 7.01 of the CSA, entitled "Further Assurances," pursuant to which each party agreed, at the other's request, to "do and perform or cause to be done and performed all such further acts and furnish, execute and deliver such other documents, instruments, certificates, notices or other further assurances as the requesting party may reasonably request, from time-to-time, to consummate the transactions contemplated by this Agreement ...."  (PEx. 1 Art. 7.01).

Supp. 2d 168, 172 (D. Mass. 2010) ("It is well-settled that even a fully-integrated written contract can be modified by subsequent oral agreement and that such modification may be inferred from the parties' conduct and the surrounding circumstances.").  Along those lines, the parties dispute whether Formulatrix requested documents in a timely manner and/or whether Rigaku was required to produce the same information multiple times.  Finally, but without limitation, there is evidence in the record that Formulatrix's insistence that Rigaku quality check its documents, a requirement not included in the contract, slowed down the production of documents which may have resulted in a waiver of the 90 day deadline.  (See DEx. 16 at 1-2).  On the other hand, it is undisputed that Rigaku did not produce all of the historical instrument sales and service revenue records within 90 days.  (See DOppF ¶ 27; PROppF ¶ 27).  In sum, there are disputed facts as to whether Rigaku's late production constituted a breach of contract, or whether such a breach was material.  Therefore, Rigaku's motion for summary judgment on Formulatrix's breach of contract claim related to Rigaku's record transfer obligations must be denied.

Nevertheless, for completeness this court will address Rigaku's argument that even if there was a breach caused by the late production, Formulatrix has failed to establish any damages.  While this court agrees with Rigaku, that does not moot Formulatrix's breach of contract claim.  Not only may a breach of contract entitle a party to nominal damages, see Scholz v. Goudreau, 132 F. Supp. 3d 239, 259 (D. Mass. 2015), aff'd, 901 F.3d 37 (1st Cir. 2018), but the issue of whether Rigaku breached its document production obligations is relevant to a determination as to who is the prevailing party in the present litigation.  As detailed infra, that

determination is relevant to the question of which party, if any, is entitled to attorneys' fees under the CSA.

Formulatrix argues that it suffered damages in the forms of (1) attorneys' fees, in that it filed the instant lawsuit against Rigaku to compel compliance with the record transfer provision of the CSA; (2) approximately $86,000 in excess personnel costs equaling the value of the time its personnel had to spend on the data transfer as a result of Rigaku's failure to comply with its data-transfer obligations; and (3) approximately $500,000 in unpaid service contract revenue that Rigaku has withheld in violation of CSA Art. 1.02(a).  These breach of contract damages are not supported by the record.

First, Formulatrix's assertion that Rigaku has improperly withheld $500,000 in unpaid service contract revenue in violation of CSA Art. 1.02(a) is a theory of liability and damages not made in the pleadings.  As such it will not be considered by this court as a basis for damages related to Formulatrix's breach of contract claim.  See Estrada v. Progressive Direct Ins. Co., 53 F. Supp. 3d 484, 497 (D. Mass. 2014) (holding that plaintiffs could not introduce an entirely new theory of liability in their summary judgment papers and that by doing so they were "impermissibly seek[ing] to amend [their] complaint without ever filing a motion for leave to amend pursuant to Fed. R. Civ. P. 15." (citation omitted)).

Second, this court concludes that Formulatrix has not supported any claim of damages for excess personnel costs.  Formulatrix asserts that its personnel "were forced to work unnecessarily on the data transfer" for over a year after the signing of the CSA, specifically, that employees had to spend time reconciling data as a result of Rigaku's "repeated dumps of incomplete, repetitive and disorganized data."  (Docket No. 77 at 6).  However, the CSA only

required Rigaku to complete a data dump of certain records in Excel or native format within the 90 day time frame.  Evidence of time spent by Formulatrix employees to reconcile repetitive, incomplete, or disorganized data resulting from such a data dump, does not constitute evidence of costs incurred as a result of a breach, because Rigaku was not under a duty to so organize its documents under the CSA.

To prove excess personnel costs, Formulatrix has also produced evidence in the form of a computation of time that certain employees spent working on the Rigaku document transfer (see PEx. 5 at 20), deposition transcripts (see POppExs. 1 & 2), and the time records of a Formulatrix employee.  (POppEx. 4).  However, it is not possible to determine whether the time was spent for any purpose other than fulfilling Formulatrix's burden of organizing and reconciling Rigaku's records.  Thus, the evidence is insufficient to support Formulatrix's excess employee hours theory of damages.

Formulatrix contends that its attorneys' fees are recoverable under Art. 9.12 of the CSA. Rigaku contends that it, not Formulatrix, is the party entitled to recover attorneys' fees under the CSA as the prevailing party.  The court will address the issue of attorneys' fees infra, but for present purposes it is sufficient to recognize that either party's entitlement to attorneys' fees under the contract is "a collateral matter to be determined following adjudication of the relevant claims" and is not an element of breach of contract damages.  See Doucot v. IDS Scheer, Inc., 734 F. Supp. 2d 172, 191 (D. Mass. 2010) (citation omitted).

### Breach of Reporting Obligations Under Art. 2.02

Formulatrix's Amended Complaint also asserts that Rigaku "failed to provide the reports it was obligated to provide under [Art. 2.02] of the Agreement with respect to the amortized

value of the revenue recognized by Rigaku." (Docket No. 42 ¶ 30). Rigaku has moved for

summary judgment on this claim, contending that it has given Formulatrix all of the reports it

was required to provide pursuant to Art. 2.02. Although the parties disagree about the

timeliness of the filing of these reports, Formulatrix does not appear to dispute that Rigaku has

provided all such reports. (See PR ¶ 14). Accordingly, because all such reports have been

provided, and the Amended Complaint does not assert a breach of contract claim on the basis

of the delay in filing these reports, Rigaku's motion for summary judgment on Formulatrix's

breach of contract claim, as it pertains to the reports required by Art. 2.02, is ALLOWED.

## **Breach of Obligation to Provide Accurate Representations and Warranties**

Rigaku also seeks summary judgment on Formulatrix's claim that Rigaku failed to

provide accurate representations and warranties under Schedule 5.06, in breach of the CSA. No

evidence has been provided to indicate that Rigaku did not provide accurate representations

and warranties in Schedule 5.06. Indeed, Formulatrix has indicated that once Rigaku produced

all of its invoices, quotes, and purchase orders, Formulatrix was able to verify the revenue

figures Rigaku represented and warranted in the CSA. (PReplyEx. 2 at 2).

The parties do dispute whether the pro forma revenue figure in Schedule 5.06 corres-

ponds to FYE2015 or FYE2016. (DF ¶ 8; PR ¶ 8). Formulatrix's CFO testified that Formulatrix

believed the figure was a projection of future revenue for FYE2016, and that because

Formulatrix's actual earnings from Rigaku's business were significantly less than this projection

in FYE2016, the pro forma figure was materially inaccurate. (DEx. 4 at 174; POppEx. 1 at 83).

However, Art. 5.06 of the CSA itself states that "Schedule 5.06 contains . . . profit & loss

statements related to the Support Services for fiscal year ended January 31, 2014 (historical),

January 31, 2015 (projected) and January 31, 2015 (pro forma with Key Employees on a full-time equivalent basis) . . . ."  (PEx. 1 Art. 5.06).  Given that the plain language of Art. 5.06 indicates that the pro forma figure is for FYE2015, there is no genuine issue of material fact as to whether the pro forma figure corresponds to FYE2015 or FYE2016.  It indisputably corresponds to the former.  Accordingly, Rigaku's motion for summary judgment on Formulatrix's breach of contract claim, as it pertains to accurate representations and warranties under Schedule 5.06, is ALLOWED.

### Breach of Obligations Under Art. 2.06 as to Rigaku Employees

Finally, Formulatrix's Amended Complaint alleges that "a Rigaku employee interfered with Formulatrix's attempt to hire key Rigaku employees, which resulted in Formulatrix being unable to enter into employment agreements with these key employees," in violation of Art. 2.06.  (Docket No. 42 ¶ 31).  Rigaku seeks summary judgment on this claim, arguing that there is no genuine issue of material fact as to whether Rigaku interfered with Formulatrix's ability to hire its employees.  This court disagrees.

Formulatrix alleges that Tom Vorndran, the director of engineering at Rigaku Automation, Inc., interfered with Formulatrix's attempts to hire two other Rigaku employees, Rollan Mosko and Andrew Provost, who both ultimately declined to accept Formulatrix's offer.  (See Docket No. 77 at 8).  Formulatrix's allegation of interference is based on the testimony of a former Rigaku employee, who Formulatrix did hire, Adolfo Martinez.  Martinez testified that in the time period when Formulatrix was making employment offers to Rigaku employees, Mosko, Provost, and Vorndran met with one another.  (POppEx. 3 at 45).  Martinez does not know what was discussed at this meeting.  (Id. at 48).  Martinez testified that Mosko later called a meeting

of the Rigaku employees who had been offered jobs with Formulatrix, which included Martinez
and Provost.  (Id. at 46).   Martinez testified that Mosko stated at the meeting that he wanted
Formulatrix to make an employment offer to Vorndran and another employee, and suggested
that "if we walk in with these demands, that we should be able to get these demands because
without any of us, this deal wouldn't go through."  (Id. at 46-47).   Martinez also testified that he
heard Vorndran, Provost, and Mosko each relay the same message to Formulatrix – that the
company did not have a plan to succeed – "word for word," and that he found this behavior
"odd."  (Id. at 44).  Provost's subsequent email declining the employment offer used similar
wording.  (See DReplyEx. 8 at 1).  In addition to Martinez's testimony, a Formulatrix employee
memorialized a conversation he had with Provost in an email, stating "[Provost] doesn't feel
like we have the right team in place to make this work.  He seemed to think we really needed
[Vorndran] in order to form a successful team."  (Id.).  The email also indicated that "[Provost]
seemed to imply that [the Rigaku employees] should all be talking on their side and deciding on
whether to join as a group, not as individuals."  (Id.).

Mosko, Provost, and Vorndran deny any such interference, and neither Mosko nor
Provost referenced Vorndran in their emails declining employment.  (DReplyEx. 2 at 2;
DReplyEx. 3 at 3; DReplyEx. 4 at 3; DReplyEx. 8 at 1; DReplyEx. 9 at 1).  However, construing the
evidence in the light most favorable to Formulatrix, Martinez's testimony at the very least
indicates that Mosko tried to intercede in connection with Formulatrix's ability to hire Rigaku
employees by encouraging them to band together and make demands, and the email indicates
that Provost had a similar attitude.  Based on the evidence of the meeting between Mosko,
Provost, and Vorndran, their identical statements to Rigaku, and Mosko and Provost's

insistence that Formulatrix hire Vorndran, there may be sufficient evidence for a reasonable

factfinder to conclude that Vorndran asked Mosko and Provost to leverage their offers on his

behalf, and that this action constituted wrongful interference, a conclusion about which this

court expresses no opinion.  Nevertheless, there is a genuine dispute of material fact and

Rigaku's motion for summary judgment on Formulatrix's breach of contract claim, as it pertains

to interfering with hiring Rigaku employees, is DENIED.

> **C.  Formulatrix's Breach of Covenant of Good Faith and Fair Dealing Claim Against Rigaku**

Rigaku has also moved for summary judgment with respect to Count II of Formulatrix's

Amended Complaint, in which Formulatrix asserts a claim for breach of the implied covenant of

good faith and fair dealing.  "Under Massachusetts law, every contract implies good faith and

fair dealing between the parties to it."  Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 237 (1st

Cir. 2013) (quotations, citation and punctuation omitted).  "The covenant of good faith and fair

dealing requires that 'neither party shall do anything that will have the effect of destroying or

injuring the right of the other party to the fruits of the contract.'"  Id. at 237-38 (quoting T.W.

Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 570, 924 N.E.2d 696, 704 (2010)).  "Put

another way, the parties to a contract implicitly agree 'to deal honestly and in good faith in

both the performance and enforcement of the terms of their contract.'"  Biltcliffe v. Citi-

Mortgage, Inc., Civil Action No. 12-11967-FDS, 2013 WL 3466886, at *7 (D. Mass. July 10, 2013)

(quoting Hawthorne's, Inc. v. Warrenton Realty, Inc., 414 Mass. 200, 211, 606 N.E.2d 908, 914

(1993).  Thus, "the purpose of the covenant is to guarantee that the parties remain faithful to

the intended and agreed expectations of the parties in their performance."  Id. (alteration

omitted) (quoting <u>Uno Rests., Inc. v. Boston Kenmore Realty Corp.</u>, 441 Mass. 376, 385, 805

N.E.2d 957, 964 (2004)).

"A breach [of the covenant of good faith and fair dealing] occurs when one party

violates the reasonable expectations of the other."  <u>Weiler v. PortfolioScope, Inc.</u>, 469 Mass. 75,

82, 12 N.E.3d 354, 362 (2014)) (quotations and citations omitted).  "There is no requirement

that bad faith be shown; instead, the plaintiff has the burden of proving a lack of good faith."

<u>Robert & Ardis James Found. v. Meyers</u>, 474 Mass. 181, 189, 48 N.E.3d 442, 450 (2016) (quoting

<u>Weiler</u>, 469 Mass. at 82, 12 N.E.3d at 362) (additional citations omitted).  "However, '[t]he

scope of the covenant is only as broad as the contract that governs the particular relationship.'"

<u>Id.</u> (quoting <u>Ayash v. Dana-Farber Cancer Inst.</u>, 443 Mass. 367, 385, 822 N.E.2d 667, 684,

(2005)).

Even construing the evidence in the light most favorable to Formulatrix, no evidence has

been produced to show that Rigaku did not act in good faith.  Formulatrix was understandably

frustrated that the record transfer process was proceeding slowly and that Rigaku was not

providing "clean" data.  However, there is no evidence that Rigaku was deliberately trying to

slow down the process or provide Formulatrix with a poorer version of the data that Rigaku had

internally.  (<u>See</u> DOppEx. 9 at 85-86 ("I do not believe they were intentionally giving us dirty

data")).  When Formulatrix later proposed amending the CSA to include new, specific provisions

to address the data transfer, including penalties for failing to transfer the data in the manner

Formulatrix desired, Rigaku's CFO responded to the proposal, indicating that he would solicit

feedback from Rigaku employees.  (<u>See</u> PEx. 18 at 1).  While the emails between the parties

demonstrate that they disagreed about the scope of Rigaku's obligations under Art. 2.04,

Rigaku still continued to work with Formulatrix to provide the data in the manner Formulatrix requested.  (See PEx. 20 at 1).  Thus, there is no genuine issue of material fact and Rigaku's motion for summary judgment on Formulatrix's claim of breach of the covenant of good faith and fair dealing is ALLOWED.

> **D.     Rigaku's Claims Against Formulatrix for Delayed Installment Payments**

In its Counterclaim, Rigaku asserts both a breach of contract claim and a breach of the covenant of good faith and fair dealing claim against Formulatrix for failing to timely pay installment payments to Rigaku.[6]  Both Formulatrix and Rigaku have moved for summary judgment on the breach of contract claim.  Formulatrix has also moved for summary judgment on the breach of the covenant of good faith and fair dealing claim.  It is undisputed that while Formulatrix did not tender the installment payments to Rigaku when due, Formulatrix has since paid all installment payments to Rigaku owed under the CSA.  (PF ¶¶ 20-21; DR ¶¶ 20-21).[7] This court concludes that even if Rigaku breached the record transfer provision and such breach was material,[8] Formulatrix could not legally choose to withhold installment payments when it had already decided to continue performance on the contract.  Therefore Formulatrix's motion for summary judgment is DENIED and Rigaku's motion is ALLOWED.

---

[6]  In its Counterclaim, Rigaku also asserts that Formulatrix breached the contract and breached the covenant of good faith and fair dealing by failing to comply with its service and support obligations under the CSA.  Because neither party has moved for summary judgment on the basis of Formulatrix's service and support obligations, this court will not address the issue.

[7]  Contrary to Formulatrix's assertion, Rigaku's breach of contract claim is not rendered moot by the fact that Formulatrix paid all of the installment payments.  Formulatrix withheld payment for nearly a year, and Rigaku is entitled to interest as damages for the delay.  See Boston Children's Heart Found., Inc. v. Nadal-Ginard, 73 F.3d 429, 441-42 (1st Cir. 1996).

[8]  Accordingly, it is unnecessary for this court to address the issue of whether Rigaku's breach of the record transfer provision was material.

Where a material breach occurs "before the injured party has fully performed his duties with respect to the expected exchange," the breach operates "as the non-occurrence of a condition of those remaining duties," which "will at least justify the injured party in suspending his performance[.]"  Restatement (Second) of Contracts § 243 cmt. a (1981); Ward v. Am. Mut. Liab. Ins. Co., 15 Mass. App. Ct. 98, 100-01, 443 N.E.2d 1342, 1343-44 (1983) (citing, generally, § 243); Prozinski v. Ne. Real Estate Servs., LLC, 59 Mass. App. Ct. 599, 610 n.8, 797 N.E.2d 415, 424 n.8 (2003) ("'A material failure of performance . . . operates as the non-occurrence of a condition.'  Restatement (Second) of Contracts § 237 comment a (1981).  Nonoccurrence of a condition, in turn, postpones or terminates the promisor's obligation to perform.  Id. at § 225.").  However, "[i]t is well established that conduct indicating a willingness to continue to honor a contract, despite knowledge that the other party has failed to perform, 'operates as a promise to perform in spite of that non-occurrence.'"  AccuSoft Corp. v. Palo, 237 F.3d 31, 55 (1st Cir. 2001) (quoting Restatement (Second) of Contracts § 246).

After the record transfer deadline passed on April 20, 2015, Formulatrix did not initially choose to suspend its performance.  Rather, it is undisputed that Formulatrix began to take over Rigaku's support obligations as of mid-April 2015 and accepted the benefits of the contract.  (See PROppF ¶ 18).  Nine months later, Formulatrix took its first action to suspend performance under the contract by withholding the installment payments.  Having already chosen to continue to perform the contract and sue for partial breach, Formulatrix could not subsequently choose to also halt performance on the installment payments.  See AccuSoft Corp., 237 F.3d at 55.  See also RGJ Assocs., Inc. v. Stainsafe, Inc., 338 F. Supp. 2d 215, 226 & n.24 (D. Mass. 2004); Restatement (Second) of Contracts § 246.  Thus, Formulatrix's failure to

timely remit the installment payments to Rigaku constitutes an unexcused breach of its

obligations under the CSA as a matter of law.  Additionally, by withholding the payments after

having chosen to continue the contract, Formulatrix violated Rigaku's reasonable expectation

that it would timely receive such payments.  See Weiler, 469 Mass. at 82, 12 N.E.3d at 362

(breach of the covenant of good faith and fair dealing occurs when "one party violates the

reasonable expectations of the other.").  Accordingly, Formulatrix's motion for summary

judgment on Counts I and II of Rigaku's Counterclaim is DENIED and Rigaku's motion for

summary judgment is ALLOWED.[9]

  E.  **Rigaku's ch. 93A Claim Against Formulatrix**

  In its Counterclaim, Rigaku also asserts that Formulatrix violated Mass. Gen. Laws ch.

93A by engaging in a pattern of extra-contractual demands coupled with the threat of

contractual nonperformance or litigation.  Rigaku cites both Formulatrix's behavior leading up

to its decision to file suit, as well as Formulatrix's conduct in attempting to settle as evidence of

a ch. 93A violation.  Formulatrix has moved for summary judgment on this claim.  While the

question is a close one, this court concludes that there are disputed facts[10] which require

further development of the record.  Therefore, Formulatrix's motion for summary judgment on

Rigaku's ch. 93A claim is DENIED.

---

[9]  Because Formulatrix has not asserted a setoff defense to withholding the installment payments, this court need not address the issue.

[10]  This court declines to consider events that allegedly occurred during the confidential mediation. Rigaku's interpretation of the settlement letter is questionable (see PROppF ¶ 48) and it would not be appropriate at this stage for the trial court to delve further into the substance of the settlement discussions.

"General Laws c. 93A, § 11, prohibits unfair or deceptive acts or practices among those engaged in trade or commerce." Diamond Crystal Brands, Inc., v. Backleaf, LLC, 60 Mass. App. Ct. 502, 506-07, 803 N.E.2d 744, 748 (2004). "[C]onduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 474, 583 N.E.2d 806, 821 (1991) (citation omitted). While "[n]ot every breach of contract consti-tutes a violation of G.L. c. 93A . . . a knowing violation of contractual obligations for the purpose of securing unwarranted benefits does." Diamond Crystal Brands, 60 Mass. App. Ct. at 507, 803 N.E.2d at 748. "Moreover, violations of ch. 93A must meet a higher standard of liability than do breaches of an implied covenant of good faith and fair dealing." PH Group Ltd. v. Birch, 985 F.2d 649, 652 (1st Cir. 1993).

Rigaku asserts that Formulatrix violated ch. 93A by threatening to withhold service support from Rigaku's customers and later threatening suit unless Rigaku agreed to additional obligations in the record transfer beyond those required by the CSA. In support of the former, an email in the record indicates that the day after the record transfer deadline, Formulatrix employees were "asked to stop performing support work on behalf of [Rigaku]." (DOppEx. 25 at 1). When Rigaku's CFO brought this to the attention of Stevenson, Formulatrix's President, however, Stevenson emphatically stated that Formulatrix employees "were NOT told to stop support of [Rigaku] products." (PReply Ex. 4 at 1). He apologized for "[his] end of that miscom-munication" and went on to state that "[t]o be very clear, we are continuing to move forward with taking over support and we don't want to negatively impact any of the customers on the support side." (Id. at 2). Rigaku's CFO appears to have taken these assurances as genuine, later

expressing his own belief that "[Stevenson] and Formulatrix are sincere in taking over the Service." (PEx. 19 at 2). Additionally, the record does not indicate that Formulatrix employees stopped servicing Rigaku customers. (See PReplyEx. 3 at 112). Given Stevenson's assertion that its employees would not stop providing support and his apology for the miscommunication, the evidence cannot be fairly construed as showing that Formulatrix attempted to extract extra-contractual benefits by refusing to service Rigaku customers.

As to Rigaku's second assertion, Formulatrix did eventually threaten suit unless Rigaku agreed to amend the CSA. (See DOppEx. 29 at 1). Admittedly, the mere threat of litigation is not itself a knowing violation of a contractual obligation. Contra Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 52 (1st Cir. 1998) (ch. 93A violation found where party failed to pay obligations and subsequently attempted to "force favorable price concessions through the threat of litigation."). Similarly, a genuine disagreement over contractual obligations does not, in and of itself, state a ch. 93A violation. See Jasty v. Wright Med. Tech., Inc., 528 F.3d 28, 38 (1st Cir. 2008) (no ch. 93A violation where party's conduct was based on genuine dispute about what contract required).

In the instant case, however, Rigaku has alleged that Formulatrix demanded the produc-tion of documents in formats clearly not required by the contract, demanded the production of historical information that was allegedly not called for under the CSA, failed to identify docu-ments it was allegedly seeking in a timely manner, and delayed the request for such documents in order to justify non-payment of amounts due under the contract. After the passage of the record transfer deadline, Rigaku's CFO sent an email seemingly indicating that a Formulatrix executive had said that they "wanted [their] money back." (PReplyEx. 4 at 2). Formulatrix

subsequently proposed an amendment to the CSA that had provisions which would allow

Formulatrix to receive a refund of the $2 million in consideration it had already paid and

potentially release Formulatrix from its obligation to pay the installment payments if Rigaku did

not meet certain conditions (See PEx. 18 at 4).  After Rigaku rejected adding any such large

scale penalty to the CSA, Formulatrix's President subsequently emailed Rigaku stating that "If I

do not receive an unequivocal statement that Rigaku will amend the contract to include the

specific terms set forth in detail in my May 5th email . . . we will exercise all our legal rights and

remedies." (PEx. 19 at 1; DReplyEx. 11 at 2).  Formulatrix subsequently filed suit and continued

with the contract, but still chose to withhold installment payments from Rigaku for nearly a

year.  A reasonable factfinder could conclude that this behavior constituted an unfair and

deceptive act or practice.  Formulatrix's motion for summary judgment as to Rigaku's ch. 93A

claim is DENIED.

> **F.** **Formulatrix's Guaranty Provision Claim Against Rigaku**

Rigaku also moves for summary judgment on Formulatrix's guaranty provision claim,

under Art. 2.07 of the CSA.  By this provision, Rigaku Americas Holding, Inc. has guaranteed

Rigaku Automation, Inc.'s obligations under the CSA.  Rigaku argues that it is entitled to sum-

mary judgment on this claim because Formulatrix cannot demonstrate any actual damages.  At

this stage in the litigation, however, it remains undetermined whether Rigaku breached the CSA

or whether it is liable for nominal damages and/or attorneys' fees.  Accordingly, Rigaku's

motion for summary judgment on this claim is DENIED.

**G.      Attorneys' Fees**

Finally, the parties move for summary judgment on their claims for attorneys' fees.  The

provision of attorneys' fees is set forth in Art. 9.12 of the CSA, which provides:  "In any action or

proceeding brought to enforce any provision of this Agreement, or where any provision hereof

or thereof is validly asserted as a defense, the successful party shall be entitled to recover

reasonable attorneys' fees in addition to any other available remedy."  (PEx. 1 Art. 9.12).

Formulatrix asserts that it should be deemed the successful party in the litigation, having

achieved its purpose in initiating the litigation by successfully compelling Rigaku to comply with

its record transfer obligations.  Rigaku counters that this court should conduct a claim-by-claim

analysis to determine which party is the "successful party" entitled to attorneys' fees for each

claim.

The provision at issue "is plain spoken and '[successful] party' is to be understood in the

ordinary or popular sense, and given commonsense meaning[.]"  Bardon Trimount, Inc. v.

Guyott, 49 Mass. App. Ct. 764, 778, 732 N.E.2d 916, 926 (2000) (citations omitted).  The

commonsense meaning of "successful" in the context of a litigation is the party that wins

judgment in its favor.  See id. at 779, 732 N.E.2d at 927 ("a plaintiff does not 'prevail' without

obtaining relief.").  It requires more than a party's internal, subjective view of success.  Cf.

Farrar v. Hobby, 506 U.S. 103, 112-13, 113 S. Ct. 566, 573-74, 121 L. Ed. 2d 494 (1992) ("Of

itself, 'the moral satisfaction [that] results from any favorable statement of law' cannot bestow

prevailing party status." (quoting Hewitt v. Helms, 482 U.S. 755, 762, 107 S. Ct. 2672, 2676,

96 L. Ed. 2d 654 (1987))).  Accordingly, Formulatrix's argument that it should be considered the

successful party simply because it accomplished its overall objective for filing suit is unpersuasive.  Such a flexible conception of "successful" would discourage compromise, because "yielding any ground of controversy also [would mean] yielding the status of the prevailing or successful party."  Bird v. Bird, 24 Mass. App. Ct. 362, 364-65, 509 N.E.2d 289, 290 (1987).

Rigaku contends that the successful party should be determined on a claim-by-claim basis, citing Northern Associates, Inc. v. Kiley, 57 Mass. App. Ct. 874, 880-881, 787 N.E.2d 1078, 1084 (2003).  In Kiley, the court ruled that the attorneys' fees provision contemplated that "one or both parties may prevail in the enforcement of rights or remedies under the [contract] as well as in the defense of a claimed breach or default of the [contract]."  Id. at 879, 787 N.E.2d at 1083.  This court concludes that this approach is not appropriate in the instant case, where most of the parties' claims are legally and factually intertwined with one another.

In the instant case, it is premature to determine which party is entitled to attorneys' fees or whether awarding attorneys' fees is appropriate at all.  See Doucot, 734 F. Supp. 2d at 191 (successful party determined at conclusion of case based on which party was more successful overall); Bird, 24 Mass. App. Ct. at 365, 509 N.E.2d at 291 (determining "successful party" on a comparative basis); Browning-Ferris Indus., Inc. v. Casella Waste Mgmt. of Mass., Inc., 79 Mass. App. Ct. 300, 314-15, 945 N.E.2d 964, 975-76 (2011) (a split decision on key issues "precludes either side from the usual status of 'prevailing party.'").  The key issues remain undecided as they are based on disputed facts.  Thus, after pouring through the extensive summary judgment record, this court cannot yet conclude whether Rigaku's extended document production constituted a material breach of the contract, or whether Formulatrix's reaction to Rigaku's production was justified or constituted a violation of Mass. Gen. Laws

ch. 93A. Thus, "this court awaits the final adjudication on the merits before it will entertain requests for attorneys' fees." Doucot, 734 F. Supp. 2d at 191. Both parties' motions for summary judgment as to attorneys' fees are therefore DENIED.

### IV. CONCLUSION

For all the reasons detailed herein, Formulatrix's Motion for Partial Summary Judgment (Docket No. 66) is DENIED and Rigaku's Motion for Partial Summary Judgment (Docket No. 70) is ALLOWED IN PART AND DENIED IN PART. Specifically, Rigaku's motion is ALLOWED with respect to Count I of Rigaku's Counterclaim (breach of contract), Count II of Formulatrix's Amended Complaint (breach of covenant of good faith and fair dealing), but DENIED with respect to Count IV of Formulatrix's Amended Complaint (guaranty) and Count V of Rigaku's Counterclaim (attorneys' fees). With respect to Count I of Formulatrix's Amended Complaint (breach of contract), Rigaku's motion is ALLOWED as to the reports required by Art. 2.02 and accurate representations and warranties under Schedule 5.06, but otherwise DENIED.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge